DARIN W. SNYDER (S.B. #136003)
dsnyder@omm.com
LUANN L. SIMMONS (S.B. #203526)
lsimmons@omm.com
DAVID S. ALMELING (S.B. #235449)
dalmeling@omm.com
MARK LIANG (S.B. #278487)
mliang@omm.com
BILL TRAC (S.B. #281437)
btrac@omm.com
AMY K. LIANG (S.B. #291910)
aliang@omm.com
SORIN G. ZAHARIA (S.B. #312655)
szaharia@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone:      (415) 984-8700

STACY YAE (S.B. #315663)
syae@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope St., 18th Floor
Los Angeles, CA 90071
Telephone:      (213) 430-6000

*Attorneys for Defendants Google LLC and Waze Mobile Ltd.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| AGIS SOFTWARE DEVELOPMENT LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:22-cv-04826-BLF<br>(Consolidated case)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date: September 7, 2023<br>Time: 9:00 a.m.<br>Judge: Hon. Beth Labson Freeman<br>Courtroom: 3, Fifth Floor |
| AGIS SOFTWARE DEVELOPMENT LLC,<br><br>Plaintiff,<br><br>v.<br><br>WAZE MOBILE LTD.,<br><br>Defendant. | Complaint Filed: November 4, 2019 |

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT .................................... 2

III. STATEMENT OF FACTS ...................................................................................... 2

    A. AGIS's Asserted Patents And Claims .......................................................... 2

    B. Accused Google Software Applications ........................................................ 5

        1. Find My Device ("FMD") ................................................................ 5

        2. Google Maps Mobile ("GMM") ...................................................... 6

    C. The Accused Waze Products ........................................................................ 8

        1. The Waze Application ("Waze App") ............................................... 8

        2. Waze Carpool ................................................................................ 10

    D. Waze Had No Pre-Suit Knowledge Of The Asserted Patents .......................... 10

    E. The Asserted Patents' Priority Chain ............................................................ 10

IV. LEGAL STANDARD .......................................................................................... 12

V. GOOGLE DOES NOT INFRINGE THE ASSERTED PATENTS ................................... 12

    A. FMD And GMM Do Not Infringe Any Asserted Claim Because They Do Not Meet The "group" Limitations ........................................................... 12

        1. FMD .............................................................................................. 13

        2. GMM ............................................................................................. 13

    B. FMD and GMM Do Not Infringe The '251, '838, Or '123 Patents Or '829 Patent, Claims 41, 60 Because They Do Not Meet "sending data" Limitations ................................................................................................ 15

        1. FMD .............................................................................................. 15

        2. GMM ............................................................................................. 16

    C. GMM Does Not Infringe The '829 Patent Because GMM Does Not Meet The "remote control" Limitations ............................................................... 17

VI. WAZE DOES NOT INFRINGE THE '829 OR '123 PATENT ...................................... 17

    A. The Accused Waze Products Do Not Meet The "group" Limitations ................ 17

    B. AGIS's Infringement Theories Address Only The "joining" Aspect Of The "group" Limitations And Have No Merit ...................................................... 19

        1. Opening The Waze App Or Waze Carpool Does Not Satisfy The "request to join a group" Limitations .............................................. 20

        2. A Request To Download The Waze App Or Waze Carpool Is Not A "request to join a group" Or A "message relate[d] to joining a group" ........................................................................................... 20

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:22-CV-04826-BLF

**TABLE OF CONTENTS**
(continued)

                                                                                                    **Page**

        3.     Sharing A Location With Friends Or Contacts In The Waze App Or Waze Carpool Does Not "join a group" ...................................................... 21

        4.     Because There Is No "group" In Waze Carpool, Riders/Drivers Cannot Be Invited To Join A "group" .................................................. 22

VII.    THE ASSERTED PATENTS ARE ANTICIPATED BY THE '724 PATENT ................ 22

    A.    The '410 Application Fails To Incorporate The '724 Patent ................................. 24

    B.    The '410 Application Does Not Support The Asserted Claims' Limitation Of Receiving Georeferenced Maps From A Server ................................................ 25

    C.    The '724 Patent Antedates And Anticipates The Asserted Claims ........................ 29

VIII.   WAZE CANNOT BE A WILLFUL INFRINGER .............................................................. 29

IX.    CONCLUSION .................................................................................... 30

# TABLE OF AUTHORITIES

Page

**CASES**

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010)........................................................................... 28

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021)............................................................................. 29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................ 12

*Exigent Tech., Inc. v. Atrana Sols., Inc.*,
442 F.3d 1301 (Fed. Cir. 2006)..................................................................... 20, 22

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
136 S. Ct. 1923 (2016)................................................................................... 29, 30

*Hollmer v. Harari*,
681 F.3d 1351 (Fed. Cir. 2012)..................................................................... 23, 26

*In re De Seversky*,
474 F.2d 671 (C.C.P.A. 1973) ............................................................................ 25

*In re Hogan*,
559 F.2d 595 (C.C.P.A. 1977) ............................................................................ 23

*In re Lund*,
376 F.2d 982 (C.C.P.A. 1967) ............................................................................ 25

*Ledergerber Med. Innovations, LLC v. W.L. Gore & Assocs., Inc.*,
736 F. Supp. 2d 1172 (N.D. Ill. 2010) ............................................................... 25

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997)........................................................................... 28

*Northrop Grumman Info. Tech., Inc. v. United States*,
535 F.3d 1339 (Fed. Cir. 2008)........................................................................... 24

*Power Integrations, Inc. v. ON Semiconductor Corp.*,
No. 5:16-cv-06371-BLF (N.D. Cal. Aug. 7, 2019)............................................. 30

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008)........................................................................... 23

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016)........................................................................... 30

*Zenon Env't, Inc. v. U.S. Filter Corp.*,
506 F.3d 1370 (Fed. Cir. 2007)............................................................... 23, 24, 29

**RULES**

Fed. R. Civ. P. 56(a)................................................................................................. 12

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on September 7, 2023, in Courtroom 3, Fifth Floor, of the United States District Court for the Northern District of California, San Jose Division, located at 280 South First Street, San Jose, California, or as soon thereafter as the matter may be heard, a hearing will be held by the Honorable Beth Labson Freeman, United States District Judge, on Defendants Google LLC ("Google") and Waze Mobile Ltd. ("Waze")'s Motion for Summary Judgment.

Google moves the Court for summary judgment that (1) Google does not infringe the asserted claims of U.S. Patent No. 9,445,251 ("'251 Patent"), U.S. Patent No. 9,467,838 ("'838 Patent"), U.S. Patent No. 9,749,829 ("'829 Patent"), or U.S. Patent No. 9,820,123 ("'123 Patent"); and (2) the asserted claims of the '251 Patent, '838 Patent, '829 Patent, and '123 Patent are invalid as anticipated by U.S. Patent No. 7,630,724 ("'724 Patent"). The '251, '838, '829, and '123 Patents are collectively referred to herein as the "Asserted Patents."[1]

Waze moves the Court for summary judgment (1) that Waze does not infringe the asserted claims of the '829 Patent or '123 Patent; (2) that the asserted claims of the '829 Patent and '123 Patent are invalid as anticipated by the '724 Patent; and (3) that Waze cannot be found to have willfully infringed the asserted claims of any Asserted Patent.

This Motion is based on the following Memorandum of Points and Authorities,[2] the accompanying declaration of Mark Liang, the pleadings and records on file in this action, and such other written and/or oral arguments as may be presented at or before the time this Motion is taken under submission by the Court.

---

[1] Google has filed a separate Rule 12(b)(1) motion to dismiss the one additional asserted patent not addressed in this motion, U.S. Patent No. 8,213,970. ECF 425.

[2] The Court permitted Defendants an additional five (5) pages, or thirty (30) pages total, for their Memorandum of Points and Authorities. ECF 428 (3/1/23 Hr'g Tr.) at 15:7-15.

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.    **INTRODUCTION**

AGIS filed this action over three years ago, initially asserting 266 claims across six patents. But AGIS's assertions against Google and Waze have now been reduced to 44 claims across five patents. Through claim construction, fact and expert discovery, dispositive motions, and preparation for the previously impending trial in the Eastern District of Texas, the relevant facts concerning the accused products are now undisputed, as is the interpretation of the remaining claims. This case is, thus, ripe for summary judgment.

The Asserted Patents are directed to fundamentally different uses and applications from those provided by the accused Google and Waze products, and, as a result, the accused products do not infringe any asserted claims. The patents' stated goal is to help first responders, military, and emergency personnel responding to emergencies or threats by forming "ad hoc groups" of users who can see each other's real-time locations and coordinate their activities. The accused Google products—Find My Device ("FMD") and Google Maps Mobile ("GMM")—and Waze products—Waze app and Waze Carpool—by contrast, are consumer applications that do not allow forming "ad hoc groups" but instead provide users with functionality such as finding a lost device (FMD), navigating a route (GMM and Waze app), and booking carpool rides (Waze Carpool).

Reflecting these fundamental differences, FMD, GMM, Waze app, and Waze Carpool do not practice several limitations of the Asserted Patents: *First*, none of the four accused applications have or support the use of "groups" at all, much less "groups" that allow members to share locations bidirectionally—key requirements of all asserted claims. *Second*, FMD and GMM do not allow one device to "send data" to another device by tapping a symbol corresponding to that other device on the screen, as required by nearly all asserted claims. *Third*, GMM does not permit one device to "remotely control" another device, as required by the asserted claims of the '829 Patent. Because the evidence is clear that the accused products operate in fundamentally different ways than the claimed invention, this Court should grant summary judgment of non-infringement.

The evidence is equally clear that the Asserted Patents are invalid as anticipated by their ancestor, U.S. Patent No. 7,630,724 ("'724 Patent"), to which they all purport to claim priority.

There is **no dispute** that the '724 Patent discloses every limitation of the asserted claims. The sole dispute is whether the Asserted Patents cannot properly claim priority back to the '724 Patent due to a broken priority chain. As a matter of law, for the Asserted Patents to claim priority to the '724 Patent, **every** intervening application filed between them must provide written description support for the Asserted Patents' claims. But the record irrefutably shows that the Asserted Patents do not meet this continuity of disclosure requirement. The intervening applications that followed the '724 Patent—including U.S. Application No. 14/027,410 ("'410 Application")—do not include written description support for the Asserted Patents' claims and fail to incorporate the '724 Patent by reference. As a result, the '724 Patent is prior art to, and anticipates, all claims.

Finally, because it is undisputed that Waze had no pre-suit knowledge of the '829 or '123 Patents, this Court should grant summary judgment of no willful infringement by Waze.

## II.    STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1.    Whether Google does not infringe any Asserted Patent because FMD and GMM do not satisfy the "group" limitations and other limitations required by all claims asserted against Google.

2.    Whether Waze does not infringe the '829 or '123 Patent because the Waze app and Waze Carpool do not satisfy the "group" limitations required by all claims asserted against Waze.

3.    Whether the asserted claims of the Asserted Patents are anticipated by the '724 Patent because the Asserted Patents' priority claim to the '724 Patent is broken by intervening applications that fail to provide written description support for the claims.

4.    Whether Waze cannot be found to have willfully infringed the '829 or '123 Patent because it is undisputed Waze had no pre-suit knowledge of either patent.

## III.    STATEMENT OF FACTS

### A.    AGIS's Asserted Patents And Claims

The Asserted Patents share the same specification and are directed to forming "ad hoc" groups of mobile devices. Ex. 4 ('829) at Abstract. Users can join an ad hoc group by entering a



FIG. 1

group or "event name" and a "password," without users needing to know or enter other users' "names, telephone numbers or Email addresses." *Id*. at 5:23-24, 11:10-14. After joining, group participants can share and view each other's locations on a map interface on their device screens, as shown in Figure 1 to the right. *Id*. at 6:14-58. Using the map interface, participants can send "data (a text message . . . or chat)" to other participants by "touching his or her symbol" on the map. *Id*. at 11:19-23.

The specification explains that ad hoc groups are useful for "emergency groups, police, fire personal [*sic*], military, first responders and other groups [that] need to be able to set up ad hoc digital and voice networks easily and rapidly." *Id*. at 10:35-37. The specification gives an example of firefighters forming an emergency group with the name "Katrina Fire" and coordinating their locations and activities in response to a fire. *Id*. at 12:15-41.

AGIS asserts the following claims of the Asserted Patents against Google ("Asserted Google Claims") and Waze ("Asserted Waze Claims") (collectively, "Asserted Claims"):

| Patent | Asserted Claims (independent claims emphasized) | Independent Claims From Which Asserted Dependent Claims Depend |
|---|---|---|
| **Asserted Google Claims (asserted against FMD and GMM)** | | |
| '251 | **24**, 29, 35 | 24 |
| '838 | **1**, 5, 10, 19, 27, 38, 40 | 1 |
| '829 | 8, 20, 27, **34**, 41, 60 | 1, 34, 35 |
| '123 | 16, 17, 22, 37, 41 | 1, 14, 36 |
| **Asserted Waze Claims (asserted against Waze App and Waze Carpool)** | | |
| '829 | **1**, 4, 16, 20, 24, 27, 32, **34**, 38, 41, 45, 50, 60, 67 | 1, 34, 35 |
| '123 | **1**, 7, 10, 12, 15, 16, 17, 18, 34, **36**, 37, 41, 46, 48 | 1, 14, 23, 36 |

The Asserted Claims include four categories of claim limitations relevant to this Motion, listed below. Exhibit 1 to this Motion is a claim chart that excerpts the full language of these limitations in each of the Asserted Claims.

1.     **"group" (all Asserted Claims; relevant to non-infringement; *see* Ex. 1, § I):** These limitations require that a user's device receive a "message" or "request" to join a "group" of other users' devices and that each device in the "group" share "location information" with other

users' devices in the "group." As one example, the '123 Patent, Claim 1 recites: "performing, by a first device: receiving a message sent by a second device, *wherein the message relates to joining a group*." Claim 1 then recites that after the first device joins the group, it must both "send" its location to other devices in the group and "receive" the locations of those other devices, via a server.

> [first device] *sending first location information to a first server and receiving second location information from the first server*, the first location information comprising a location of the first device, the second location information comprising one or more locations of one or more respective second devices included in the group;

This explicitly requires that the location sharing be *bidirectional*: each user's device must both send and receive location information with other users' devices in the "group." In this manner, and consistent with the specification's description and depiction in Figure 1, each user can access and view the locations of other users in the "group."

The term "group" has been construed to mean: "more than two participants associated together." ECF 147 at 11. AGIS's expert, Mr. McAlexander, conceded that within the construction, a "participant" is a "user" of a mobile device. Ex. 6 (McAlexander Dep. Tr.) at 88:25-89:4. Thus, the "group" limitations require (1) joining a group of more than two users with devices and (2) sharing location information bidirectionally among them.

2. **"sending data" to "selected" devices (all claims of '251, '838, '123 Patents and Claims 41 and 60 of the '829 Patent; relevant to non-infringement; *see* Ex. 1, § II)**: These limitations require that a user select a symbol on a map corresponding to another device and then "send data" to the selected device. As one example, Claim 1 of the '838 Patent recites:

> identifying user interaction with the interactive display *selecting one or more of the second set of user selectable symbols* corresponding to one or more of the second devices and positioned on the second georeferenced map . . . and, *based thereon, sending* third *data to the selected one or more second devices* . . .

3. **"remote control" (all claims of '829 Patent; relevant to non-infringement; *see* Ex. 1, § III):** These limitations require that a "first device" engage in "remote control operations"

with other devices.  For example, Claim 1 of the '829 Patent recites: "***authorizing the first device to*** repeatedly share device location information and ***repeatedly engage in remote control operations with each device included in the group***."

4.      **"georeferenced map" from "server" (all Asserted Claims; relevant to invalidity; *see* Ex. 1, § IV)**:  These limitations require that a device receive a "georeferenced map" (or "georeferenced map data") from a "server."  As one example, the '829 Patent's Claim 35 (from which asserted Claims 41 and 60 depend) recites that a "second device" "receiv[es], from a second server, georeferenced map data."  The specification explains that a "georeferenced map" is a map with additional data correlating the "x and y coordinates" on the screen to real-world latitude and longitude positions.  Ex. 4 ('829) at 7:2-8.

### B.      Accused Google Software Applications

#### 1.      Find My Device ("FMD")

As its name suggests, FMD allows a ***single*** user to find that user's own device(s), such as a smartphone.  Ex. 7 (Wolfe Rebuttal) ¶¶ 74-75.  To use FMD, the device a user is trying to locate must be connected to the user's Google account (e.g., via a Gmail address), and the user must sign into that account.  *Id*. ¶¶ 73, 509.  If a user has multiple devices, a user can sign into their Google account through any of those devices.  *Id*. ¶ 510.  Because FMD is a single user application, the locations of a user's devices are accessible only to that user through his or her Google account.  The locations of a user's devices cannot be accessed by other users.  *Id*. ¶ 75.  The screenshot on the left shows the user interface for FMD after opening the application and logging in.  As shown, FMD displays icons corresponding to one or more of the user's



devices above the map, with three devices shown in this example.  *Id*. ¶ 599; Ex. 9 (McAlexander

Google) Attach. D at D-a415; *see also* Ex. 8 (McAlexander Google) Attach. C at C-a103.  When the user selects an icon above the map for one of the devices (e.g., the phone icon), a green symbol showing the location of the selected device appears on the map, and a menu of options with respect to the selected device appears below the map.  Ex. 7 (Wolfe Rebuttal) ¶ 599.  As shown in the screenshot on the right, selecting the symbol for a device on the map displays the device's remaining battery capacity and wireless signal strength.  Ex. 14 (AGIS-GOOGLE00001445). Selecting the symbol does not send data to the corresponding device.  Ex. 7 (Wolfe Rebuttal) ¶ 599.

### 2.    Google Maps Mobile ("GMM")

GMM is an application that provides mapping and navigation.  *Id*. ¶ 80.  It also allows a user to share its location with another user, which is the feature accused by AGIS.  As detailed below, there are two ways a user can share location: (1) selecting another user's Google Account ID ("GAIA"), or (2) sending a URL link via a messaging application.  *Id*. ¶¶ 88-92.

**Location sharing via GAIA**:  Sharing location via GAIA occurs as a one-way share between two users via their GAIAs: (1) a sender's GAIA (Person A) to (2) a recipient's GAIA (Person B).  *Id*. ¶ 89.  The screenshots below show the user interface for GAIA sharing location.



**Sender's Device Screen**



**Recipient's Device Screen**

As depicted in the left screenshot of the sender device (Person A), the sender sees their

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

device's location (denoted "Andrew Wolfe") on a map and shares that location with another, recipient identified by the recipient's GAIA under "Share your real-time location." *Id*. ¶ 88. (In this example, to test the accused feature, Defendants' expert Dr. Andrew Wolfe shared his location with another, recipient device logged into the same GAIA belonging to "Andrew Wolfe.") When a location is shared via GAIA, the recipient (Person B) receives a notification. Clicking the notification opens GMM on Person B's phone and shows the location of Person A's device on the map, as shown in the screenshot above on the right. Importantly, the location share is one-way: the device of the receiving GAIA (Person B) does not automatically share its location back to the sender (Person A). *Id*. ¶ 89. Instead, if the recipient wants to share their device's location with the sender, the recipient must initiate and create a separate location-share. *Id*.

**Location sharing via URL link**: Like sharing location via GAIA, sharing location via URL link occurs as a one-way link shared between two users, a sender and recipient. *Id*. ¶¶ 90-94. The screenshots below show the interface on the sender's device for sharing location via URL link.



**Sender's Screen: User Interface Flow For Location Sharing Via URL Link**

To share via URL link, the sender must select a messaging application. Here, in the left-most screenshot, the sender selects the "Messages" application, which opens up a menu of existing text message conversations. *Id*. As shown in the middle screenshot, the sender selects the

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

conversation with "(408) 394-1096," which opens up that conversation. *Id*. GMM populates the message box with a URL link, which the sender can send to the recipient. *Id*.

If the recipient clicks on the URL link, GMM opens on the recipient's phone and shows the location of the sender's device on the map in the same manner as GAIA location sharing, discussed above. The sender can send the URL link to multiple users, each of whom can access it to see the sender's location. *Id*. But again, the location share is one-way only: the recipient devices do not automatically send their location back to the sender, as recipients cannot send their locations back to the sender using the same URL link. *Id*. Instead, each recipient of a location-share who wants to share their own device location with the sender must create and share a new URL link. *Id*.

After receiving and viewing the sender's shared location in GMM, the recipient can tap the symbol corresponding to a sender's location on the map, which opens up a menu of four options, shown in the screenshot below. *Id*. ¶¶ 604-606. None of the four options send any data to the sender's device. *Id*. Rather, each of the menu options only affects what is displayed on the recipient's device:

- "Refresh" pulls updated location data, if available, from the Google server, about the sender's device and does not send any data to the sender device. *Id*.

- "Add to Home screen" adds a shortcut on the main screen of the recipient's device and does not send data to the sender's device. *Id*.

- "Hide [user] from map" hides the symbol corresponding to the sender's device and does not transmit any data to the sender. *Id*.

- "Block" blocks the user corresponding to the sender's device and prevents location sharing between the sender and recipient, but does not send any data to the sender's device. *Id*.

## C.    **The Accused Waze Products**

### 1.    **The Waze Application ("Waze App")**

The Waze app is a navigation software application developed by Defendant Waze Mobile Ltd. that was first released in the United States in 2009. Ex. 7 (Wolfe Rebuttal) ¶¶ 111-112. Aside

from its primary navigation features, the Waze app has other features relevant to this Motion.

First, similar to GMM, a user can share a location in the Waze app by sending a URL link in a text message, email, or other messaging application on the user's smartphone to another user. Ex. 16; Ex. 7 (Wolfe Rebuttal) ¶¶ 118-120, 122-125. As shown in the screenshot on the left below, after a sender chooses a messaging application to share their device's location, a URL link is sent to the recipient. In the example shown, the sender transmits a link to the "Ferry Building Marketplace" in San Francisco to the recipient, inviting the recipient to drive to that location.





**Sender's Device Screen**          **Recipient's Device Screen**

The screenshot above on the right shows the recipient user's screen after clicking on the received link to display the location of the Ferry Building Marketplace. *Id.* ¶¶ 119, 126. Like the accused functionality in GMM, the recipient cannot share their device's location back to the sender by clicking on the link or using the same link provided by the sender. *Id.* ¶ 127. Indeed, the Waze app does not provide any bidirectional or multi-way location-sharing function, where the sender and recipient can each see each other's locations. *Id.* ¶ 129.

Second, the Waze app allows users who are already "friends" in Facebook to link their Facebook accounts to Waze and thereby also be listed as "friends" in the Waze app. Ex. 15

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

(Schmuelevitz Dep. Tr.) at 23:23-24:3; Ex. 7 (Wolfe Rebuttal) ¶ 724.

## 2. Waze Carpool

Waze Carpool was a software application provided in the United States by Google, not Waze, from October 2018 and October 2022, when it was discontinued. Ex. 11 (McAlexander Waze) ¶ 124; Ex. 7 (Wolfe Rebuttal) ¶ 134; Ex. 17. Waze Carpool matched a driver with one or more riders (i.e., passengers). Ex. 7 (Wolfe Rebuttal) ¶ 135. To set up a carpool, drivers used the Waze app, while riders used a separate Waze Carpool application. *Id.* ¶ 137. For safety reasons, only the driver in Waze Carpool was able to see the pick-up and drop-off locations of the riders. Ex. 18. The riders had no visibility into the locations of other riders in a carpool. *Id.*; Ex. 7 (Wolfe Rebuttal) ¶ 738. During the Covid-19 pandemic, Waze carpools were limited to two people: a rider and a driver. Ex. 18; Ex. 7 (Wolfe Rebuttal) ¶¶ 740-741.

## D. Waze Had No Pre-Suit Knowledge Of The Asserted Patents

It is undisputed that AGIS had no pre-suit contact with Waze and that Waze had no knowledge of the '829 or '123 Patents until AGIS filed its Complaint on November 4, 2019. Ex. 19 (AGIS 2d Suppl. Resp. to Waze's 1st Set of Interrogs.) at 19.

## E. The Asserted Patents' Priority Chain

As shown in the flowchart, all four Asserted Patents (blue boxes) share a common priority chain consisting of several continuations (denoted "CON") and continuations-in-part (denoted "CIP"). The '838 Patent was filed in 2014 and is the parent of the other three Asserted Patents. Ex. 2 ('838) at Cover; Ex. 3 ('251) at 1:1-25; Ex. 4 ('829) at 1:1-28; Ex. 5 ('123) at 1:1-29. The priority chain consists of several earlier applications, including the '410 Application filed in 2013 (red box in flowchart), the '724 Patent filed in 2006



DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

(green box in flowchart), and U.S. Patent No. 7,031,728 ("728 Patent") filed in 2004. Each continuation-in-part application filed before the '410 Application made substantial additions and subtractions to the specification of the application filed before it. As a result, the '410 Application differs substantially from the '724 Patent. Ex. 20 (redline comparison of '410 Application versus '724 Patent). The '724 Patent, in turn, differs substantially from the '728 Patent that preceded it. Ex. 21 (redline comparison of '724 Patent versus '728 Patent).

The '410 Application does not include any statement incorporating every earlier-filed application. Ex. 22 ¶ 1. It includes only one incorporation statement: "The method and operation of communication devices used herein are described in U.S. Pat. No. 7,031,728 which is hereby incorporated by reference and U.S. Pat. No. 7,630,724." *Id*. ¶ 5.

As discussed in Section III.A, every Asserted Claim recites the same limitation of a mobile device receiving a "georeferenced map" (or "georeferenced map data") from a "server." The '724 Patent disclosed this claim limitation, as it described a "remote *server* that causes a *geo-referenced* chart, *map*, aerial photograph or satellite image to be sent to the requestor's cell phone/PDA device." Ex. 23 ('724) at 19:2-7 (emphasis added). But the '724 Patent's disclosure of a "remote server" providing "geo-referenced" maps was not in the '728 Patent that preceded it.

The '724 Patent's disclosure also did not appear in the later '410 Application, which is critical because, as detailed in Section VII, if *any one* of the intervening applications filed after the '724 Patent fails to provide written description support for the Asserted Claims, those claims cannot claim priority to the '724 Patent. Although the '410 Application refers to a "geo-referenced map," it never states that the "geo-referenced map" is provided by a "server." Ex. 22 ¶¶ 39, 40, 44, 46. Rather, it states that map and georeferenced data is stored *locally* in the mobile device: "Mounted within housing 12 as part of the PDA [i.e., mobile device] is the display 16 and the CPU. The *internal CPU* [of a mobile device] includes databases and software application programs that provide for a *geographical map and georeferenced entities*." *Id*. ¶ 34 (emphasis added).

It is undisputed that the '724 Patent discloses each and every limitation of all Asserted Claims in the four Asserted Patents. Ex. 25 (Wolfe Opening) ¶ 487 (Defendant's expert opining that the '724 Patent anticipates all Asserted Claims); Ex. 26 (McAlexander Rebuttal) Attach. A

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

(Plaintiff's expert mapping U.S. 11/308,648—the application that issued as the '724 Patent—against all Asserted Claims); Ex. 6 (McAlexander Dep. Tr.) at 215:19-216:8, 220:14-221:13 (AGIS's expert confirming that the '724 Patent discloses all elements of all Asserted Claims).

## IV.   LEGAL STANDARD

Summary judgment should be granted if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  Summary judgment is proper if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   GOOGLE DOES NOT INFRINGE THE ASSERTED PATENTS

The Asserted Patents and Google's accused products are directed to different goals, users, and applications.  The Asserted Patents' stated goal is to provide situational awareness and coordination for a group of first responders or military personnel who are responding to emergencies, disasters, or conflict.  To that end, the patents' claims recite features of: (1) forming location-sharing "groups" of more than two users; (2) enabling group members to "send data" to other group members by tapping symbols on a map; and (3) "remote control" of other devices in the group.  Google's accused FMD and GMM products are not directed to forming groups or providing situational awareness to groups, and, thus, they do not include the recited features for coordinating real-time locations and activities among groups of more than two users.  They are instead directed to consumer applications, such as a single user finding a lost device (FMD) or sharing a location with a friend (GMM).  FMD and GMM do not practice key limitations required by *all* of the Asserted Claims, and, therefore, do not infringe.

### A.   FMD And GMM Do Not Infringe Any Asserted Claim Because They Do Not Meet The "group" Limitations

FMD and GMM do not practice the "group" limitations because, fundamentally, there is no notion of a "group" with "more than two participants" in either product, much less a location-sharing "group," as required by the claims.  FMD can only be used by a single user and does not support location sharing between different users.  And GMM only allows location sharing between two users.  In addition, GMM does not have any mechanism for "joining" any alleged "group"

through a "message" or "request," and location sharing between two users is unidirectional, not bidirectional as the claims require.

### 1. FMD

FMD does not meet the "group" limitations because it is a single-user application that allows only a single user to identify the location of that user's own device(s)—there is no "group" of users to join or share a location with. Indeed, FMD doesn't even include functionality for a user to share the location of that user's device(s) with anyone else. Rather, the only location information that a user can access and see is the location of that user's own device(s)—not the location of any other user or any other user's devices.

To the extent AGIS argues that in situations where a user has more than two devices, those devices—of the same single user—constitute a "group," that argument is foreclosed by the construction of "group" as requiring "more than two participants," which refers to human users, not devices, as AGIS's expert has admitted. ECF 147 at 11; Ex. 6 (McAlexander Dep. Tr.) at 88:25-89:4 ("Q What understanding of the term 'participants' did you apply in your analysis in this case? . . . [Plaintiff's expert]: I used the word 'user.'"). More than two *devices* of the same single user cannot constitute the recited "group."

Because there is only one participant in FMD—not "more than two" as required to form a "group"—there is no "group" in FMD. Thus, FMD does not meet the "group" limitations.

### 2. GMM

GMM's accused location-sharing functionality does not meet the "group" limitations for three reasons: (1) there is no "group" of "more than two participants"; (2) there is no mechanism to join any purported "group"; and (3) there is no bidirectional location sharing among users.

First, the accused GMM location sharing is between only two users: a sender and recipient. A sender (Person A) can share its location to a recipient (Person B) either by: (1) sharing to Person B's GAIA, or (2) sending a unique URL link to Person B via a messaging application. Ex. 7 (Wolfe Rebuttal) ¶¶ 89, 90. Person A could also share its location with another recipient (Person C) via Person C's GAIA or a URL link, but that location-share would be completely separate and independent of the location-share between Persons A and B. In particular, Person C can see only

- 13 -

Person A's location, not Person B's location; and Person B similarly sees only Person's A location, not Person C's. *Id*. ¶¶ 503, 522.  Each location-share is limited to only *two* users—GMM does not create a location-sharing "group" of "***more than two participants** associated together*," as required by the Asserted Patents.

Second, even if two users (Persons A and B) could be a "group," GMM provides no mechanism for "joining" that alleged "group" by receiving a "message" or "request," as required by the claims.  AGIS's expert, Mr. McAlexander, accuses a user signing into their GAIA account as meeting the "joining" a "group" limitation:  "the Accused Products require a user to join the corresponding network by signing-in to the device with an identifier (e.g., Google Account) . . . . The group comprises the multiple identifiers, individuals, profiles, and/or devices associated with the group."  *E.g.*, Ex. 9 (McAlexander Google) Attach. D at D-a9, a10.  But using a Google account to log into GMM does not constitute joining a "group."  As an initial matter, because a user's Google account is associated with only a single user or "participant"—not more than two, as required to form a "group"—signing into that Google account cannot result in joining any "group."  Further, simply signing into an account does not satisfy limitations requiring that a device "join" the group by receiving a "message" or "request" from another device—there is no such "message" or "request" involved as part of the sign-in process.

Third, there is no bidirectional sharing of location between users.  The "group" limitations require bidirectional location sharing because they recite that each device, upon joining the "group," must both, (1) "***send[]*** first location information [i.e., its own location]" to other devices in the "group" ***and*** (2) also "***receiv[e]*** second location information . . . the second location information comprising one or more locations of one or more respective second devices included in the group."  *E.g.*, Ex. 5 ('123) at Claim 1; Ex. 7 (Wolfe Rebuttal) ¶¶ 558-560.  But in GMM, all location sharing is unidirectional, one-to-one as shown in the diagram, depicting three hypothetical GMM users, Persons A, B, and C.  Person A can share their location with Persons B and C, but location



sharing occurs only via separate unidirectional, one-to-one shares—i.e., a one-way share from A to B and another one-way share from A to C. Persons B and C do not share their locations back to Person A, or to each other, based on receiving Person A's location-share. If Person B wants to share their location with Persons A and C, Person B would need to create their own separate unidirectional, one-to-one shares from B to A, and B to C. The same goes for Person C.

GMM's arrangement of one-to-one, unidirectional shares stands in sharp contrast to the Asserted Patents, where each user in a "group" can see the locations of other users in the "group." *See* Ex. 4 ('829) at Fig. 1. GMM accordingly does not satisfy claim limitations reflecting the bidirectional location-sharing concept of the Asserted Patents—i.e., limitations requiring that "group" members both "send" and "receive" location information with other "group" members.

Because FMD and GMM do not meet the "group" limitations, Google does not infringe any Asserted Claim of the Asserted Patents.

**B.      FMD and GMM Do Not Infringe The '251, '838, Or '123 Patents Or '829 Patent, Claims 41, 60 Because They Do Not Meet "sending data" Limitations**

FMD and GMM do not satisfy the "sending data" limitations, which require that a user select a symbol "positioned on the . . . georeferenced map" interface corresponding to another device and then "send data" to the selected device. *See* Ex. 1, § II. In both applications, selecting a symbol for a device on a map interface merely displays information about the selected device or a set of menu options, none of which permit sending data to the selected device.

**1.      FMD**

In FMD, a symbol corresponding to a device can be displayed and selected in two ways, neither of which satisfies the "sending data" limitations.

First, as shown in the screenshot to the right, symbols for a user's devices appear above the map (in red box). But the devices appearing ***above*** the map are not "positioned ***on*** the . . . georeferenced map" as required by the claims. Regardless, selecting one of the icons above the map does not send data to any of those devices. Instead, it only causes a

- 15 -

green symbol representing the location of the selected device to appear on the map.  Ex. 7 (Wolfe Rebuttal) ¶ 599.

Second, selecting the green symbol on the map also does not send data to the corresponding device.  Instead, as the screenshot shows, selecting the green symbol displays that device's remaining battery capacity and wireless signal strength.  *Id*.  Thus, FMD does not "send[] . . . data to the selected one or more second devices" based on a user selecting a symbol corresponding to a device positioned on the map as required by the "sending data" limitations.

### 2.  GMM

GMM also does not meet the "sending data" limitations.  As the screenshot below shows, GMM displays only one symbol corresponding to the sender device.  Selecting that symbol opens a menu of four options—"Refresh," "Add to Home screen," "Hide [user] from map," or "Block"— ***none*** of which results in any communication or "sending data" to the sender device.  Instead, the selection of these options causes actions to occur locally on the recipient's device.



The "Directions" and "Share location with [user]" options in the screenshot, meanwhile, do not appear based on selecting the symbol of the sender device on the map.  Rather, those options appear when a recipient of a location-share opens up GMM to see a sender's location.  Thus, these are not actions that become available in response to "selecting one or more of the second set of user selectable symbols" on a "georeferenced map," as required by the claims, and they do not therefore satisfy the "sending data" limitations.  The "Directions" option does not satisfy the "sending data" limitations for the additional reason that it does not send data to the sender's device, but instead only shows a route to that device.  Ex. 7 (Wolfe Rebuttal) ¶¶ 604-606.

Because FMD and GMM do not meet the "sending data" limitations, Google does not infringe the '251, '838, and '123 Patents, or Claims 41 and 60 of the '829 Patent.

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

**C.**   **GMM Does Not Infringe The '829 Patent Because GMM Does Not Meet The "remote control" Limitations**

GMM does not allow one device to "remotely control" any other device, as required by all asserted claims of the '829 Patent. *See* Ex. 1, § III. In particular, GMM's accused location-sharing functionality does not allow the sender of a location-share to remotely control the recipient device. The sender simply sends the recipient a text message with a URL link, which the recipient can click to open GMM and see the sender's location, or can choose to completely ignore and do nothing.

In expert discovery, AGIS and its expert, Mr. McAlexander, argued that GMM meets the "remote control" limitations because "[o]nce the first device is joined to the group, Google's Servers authorize the repeated sharing of the device location information" so that the "first device repeatedly engages in remote control operations with each device included in the group." Ex. 10 (McAlexander Google) Attach. E at A-122. This argument, however, relies on an unreasonably broad interpretation of "remote control," such that merely sending a text message with a location-share to a recipient device constitutes "remote control" of the recipient. This interpretation is not only overbroad, it also contradicts the claim language, which expressly ***differentiates*** between location sharing and remote control as two separate actions: "joining the first device to the group comprises authorizing the first device to [1] repeatedly share device location information ***and*** [2] repeatedly engage in remote control operations." Ex. 4 ('829) at Claims 1, 35 (emphasis added). Thus, merely sharing a location cannot constitute the claimed "remote control." Because GMM does not satisfy the "remote control" limitations, GMM does not infringe the '829 Patent.

**VI.**   **WAZE DOES NOT INFRINGE THE '829 OR '123 PATENT**

**A.**   **The Accused Waze Products Do Not Meet The "group" Limitations**

Like FMD and GMM, Waze app and Waze Carpool are consumer applications that do not satisfy the "group" limitations. First and foremost, and for reasons similar to GMM, the Accused Waze Products do not offer a way to form a location-sharing "group." The Waze app only allows one user (the sender) to share a location with one other user (the recipient) through a link, email, or

text. Ex. 7 (Wolfe Rebuttal) ¶¶ 119-127. The location share is between only those two users, as shown in the screenshot to the right, and the recipient sees only the sender's location. *Id*. ¶¶ 121-122. There is no "group"—i.e., "***more than two*** participants associated together"—because each location-share associates only ***two*** users together.



The required "group" is similarly absent from Waze Carpool. Waze Carpool included one driver and one or more riders. *Id*. ¶ 135. Any accused "group," therefore, must have at least two riders, along with the one driver. But for safety reasons, Waze Carpool was designed so that only the driver could see the riders' locations (i.e., pick-up/drop-off addresses). Riders could not see other riders' locations or share locations with each other—the riders were not "associated together." Ex. 18; Ex. 7 (Wolfe Rebuttal) ¶¶ 738-739; Ex. 15 (Shmuelevitz Dep. Tr.) at 100:6-16. Thus, Waze Carpool had no "group" of "***more than two*** participants associated together" because any location-sharing association was created between only ***two users***—the driver and only one rider. Further, during the Covid-19 pandemic, Waze carpools in the United States were limited to only one rider for each driver. Ex. 18; Ex. 7 (Wolfe Rebuttal) ¶¶ 740-741. So in that timeframe, Waze Carpool did not practice the "group" limitation for the additional reason that it forbade having "more than two [Carpool] participants" at all.

Second, as the above screenshot also shows, like GMM, location sharing in the Accused Waze Products is unidirectional—only the sender shares its location, not the recipient. The location sharing is not bidirectional. The recipient does not share its location back to the sender, and, thus, the sender's device will not display the recipient's location. Ex. 7 (Wolfe Rebuttal) ¶¶ 119, 121, 126-127, 129. Waze's restriction to only one-way location sharing between two users is entirely different from the bidirectional, "group" location sharing described by the Asserted Patents, where all users in a "group" can see the locations of all other users in the "group." As a result, the claim limitations requiring bidirectional location sharing between "group" members—i.e., requiring that

each device in a "group" both (1) "**send[]** first location information [i.e., its own location]" to other devices in the "group" and (2) also "**receiv[e]** second location information . . . the second location information comprising one or more locations of one or more respective second devices included in the group," *e.g.*, Ex. 5 ('123) at Claim 1—are not satisfied because the Accused Waze Products do not provide such bidirectional location sharing functionality.  Ex. 7 (Wolfe Rebuttal) ¶¶ 699-703.  Instead, each device can only send its own location to one other device as part of a location-share.  Because the Accused Waze Products do not meet the "group" limitations, Waze does not infringe the '829 or '123 Patents.

### B.   AGIS's Infringement Theories Address Only The "joining" Aspect Of The "group" Limitations And Have No Merit

AGIS accuses a scattershot of functionalities in the Accused Waze Products of meeting the "group" limitations: (1) opening the Waze app or Waze Carpool (Ex. 12 (McAlexander Waze) Attach. A at A-a11); (2) receiving a referral or invitation to download and install the Waze app or Waze Carpool (*id.* at A-a12; Ex. 13 (McAexander Waze) Attach. B at B-a8); (3) sharing a location with friends/contacts in the Waze App or Waze Carpool (Ex. 12, Attach. A at A-a34, A-a45; Ex. 13, Attach. B at B-a37, B-a48); and (4) requesting, offering, or inviting a rider/driver for a carpool in Waze Carpool (Ex. 12 at Attach. A-a12, A-a16, A-a34; Ex. 13 at B-a16, B-a37).  None of these disparate accusations come close to showing that the "group" limitations are met.

First, AGIS's accusations fail on their face because they address only the "joining" aspect of the "group" limitations.  *Id.* at Attach. A at A-a11, a12, a16, a34, a45; Ex. 13, Attach. B at B-a8, a16, a37, a48.  The accusations fail to even try to address the separate requirements that there be a "group" of more than two "associated" users and that the group members share location information with each other, bidirectionally.  As discussed above, those requirements are not satisfied because the Accused Waze Products do not have "groups."  Location sharing is between only two users, not a "group" of "more than two participants."  Further, any location sharing is only unidirectional, from one user to one other user.  Because AGIS's accusations fail to show (and indeed do not even attempt to show) that the "group" location-sharing limitations are met, summary judgment of non-infringement should be granted.

- 19 -

Second, AGIS's accusations as to all four identified functionalities fail even to satisfy the "joining" requirements of the "group" limitations as discussed below.

### 1. Opening The Waze App Or Waze Carpool Does Not Satisfy The "request to join a group" Limitations

Mr. McAlexander speculates that merely opening the Waze App or Waze Carpool satisfies the requirement in the '829 Patent claims that a device join a group by receiving a "*request* to join a group" sent by another device in the "group." *E.g.*, Ex. 4 ('829) at Claim 1 (emphasis added). He posits in his report that "on information and belief," "the servers of the Accused Products forward such a *request* when *a given Waze application is opened* on a first device." Ex. 12 (McAlexander Waze) Attach. A at A-a11, a12 (emphasis added).

But there is no evidence to support that merely opening the Waze App or Waze Carpool triggers any "request" to join a "group," and AGIS has cited none through expert discovery. *Id.*; Ex. 7 (Wolfe Rebuttal) ¶ 715; *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1308 (Fed. Cir. 2006) (holding that the burden on the party moving for summary judgment of non-infringement "may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case") (internal quotations and citations omitted). Indeed, Mr. McAlexander fails to identify what the alleged "request" is, what the "request" contains, or who sends or receives the "request" when the Waze App or Waze Carpool application is opened. Ex. 12 (McAlexander Waze) Attach. A at A-a11,-a12. Although Mr. McAlexander identifies several purported "groups"—a group of Friends (e.g., Facebook friends), a group of contacts, a team, a group of devices in a geographic area, and/or members of a carpool—he provides no explanation for how merely opening the Waze or Waze Carpool triggers the action of "forwarding" a "request" to join any such a "group," as required by the claims. *Id.* at A-a11.

### 2. A Request To Download The Waze App Or Waze Carpool Is Not A "request to join a group" Or A "message relate[d] to joining a group"

AGIS and Mr. McAlexander also accuse an invitation or referral link to download the Waze app or Waze Carpool of being the "request to join a group" recited in the '829 Patent claims and the "message relate[d] to joining a group" in the '123 Patent claims, with the alleged "group" being

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

"the group of all Waze users." Ex. 12 (McAlexander Waze) Attach. A at A-a12; Ex. 13 (McAlexander Waze) Attach. B at B-a8.

This theory fares even more poorly than their first. A referral link is only an invitation to *download* an application—clicking on the link does not open or run any Waze application. And the simple act of downloading the Waze app or Waze Carpool does not result in the user actually using or running either application, let alone performing the actions Mr. McAlexander contends are infringing. Ex. 7 (Wolfe Rebuttal) ¶ 716.

### 3. Sharing A Location With Friends Or Contacts In The Waze App Or Waze Carpool Does Not "join a group"

AGIS and Mr. McAlexander next accuse the act of a user *sharing a location* with the user's Facebook friends or contacts as satisfying the "request to join a group" or "message relate[d] to joining a group" limitations. *E.g.*, Ex. 12 (McAlexander Waze) Attach. A at A-a45 ("Waze application causes a server to forward a message to a first device related to joining a group of Waze friends and/or contacts, such as for sharing ETA, sharing a trip/drive, and/or sharing a destination"). But in the Asserted Claims, the step of a user sharing a location with a "group" is a distinct—and subsequent—step to that user "joining" a "group." For example, the '123 Patent, Claim 1 recites that a "first device" receives a "message relat[ing] to joining a group." Ex. 5 ('123) at Claim 1. Only after joining the "group" does the device perform the next step of sharing locations (i.e., "sending first location information" and "receiving second location information"). *Id*.

By accusing the act of location sharing as satisfying the "joining" step, AGIS conflates two distinct steps in the claims. AGIS's conflation dooms its infringement theory because the alleged "group" identified by AGIS—i.e., the user and the user's Facebook friends or contacts—must have *already existed and included the user* before the user could share a location with the group's members. There is no reason for a user to "join" an alleged "group" that the user was already part of before the user shared its location. Thus, the act accused by AGIS—a user sharing its location with Facebook friends or contacts—does not cause the user to "join" any alleged "group."

For example, for Facebook friends, those friend associations are first created in Facebook— a third-party application. A Waze user can then import those Facebook friends into Waze by linking

the user's Facebook account to the Waze app. *See also* Ex. 7 (Wolfe Rebuttal) ¶ 724. After the account is linked, the user's Facebook friends become the user's "friends" in the Waze app. *Id.*; Ex. 15 (Shmuelevitz Dep. Tr.) at 23:23-24:3. The user can then use Waze to share a location with those Facebook friends. To the extent the user and its Facebook friends constitute a "group," that "group" already existed in Facebook before the accused location sharing ever occurred in the Waze app. Thus, the user's act of sharing a location does not cause any "joining" of a purported "group" that includes the user's Facebook friends.

AGIS's accusation that a user sending a location share to the user's contacts satisfies the step of "joining" a "group" fails for the same reasons. Although a Waze user can share a location with another person in the user's *existing* list of Contacts, that list of Contacts must have already existed and included the user, before any act of sharing occurs using the Waze app. Thus, the user's act of sharing a location does not cause "joining" any "group." Ex. 7 (Wolfe Rebuttal) ¶¶ 728, 730-731; Ex. 15 (Shmuelevitz Dep. Tr.) at 38:18-39-3.

**4.      Because There Is No "group" In Waze Carpool, Riders/Drivers Cannot Be Invited To Join A "group"**

Finally, AGIS and Mr. McAlexander accuse requesting, offering, or inviting a rider or driver for a carpool in Waze Carpool of satisfying the "request to join a group" or "message relate[d] to joining a group" limitations. Ex. 12 (McAlexander Waze) Attach. A at A-a11-a12; Ex. 13 (McAexander Waze) Attach. B at B-a16. These arguments fail because, as discussed, there is no "group" at all in Waze Carpool.

The factual record is undisputed. Because there is a complete absence of evidence to support that the accused Waze Products satisfy the "group" limitations required by all Asserted Waze Claims, summary judgment of non-infringement is required. *Exigent*, 442 F.3d at, 1308.

**VII.      THE ASSERTED PATENTS ARE ANTICIPATED BY THE '724 PATENT**

There is no dispute that the '724 Patent, filed in 2006, discloses each and every limitation of the Asserted Claims. And while the Asserted Patents purport to claim priority to the '724 Patent, the evidence is irrefutable that this priority chain is broken by intervening applications, including the '410 Application. The '724 Patent, therefore, invalidates by anticipation all Asserted Claims.

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

"[T]o gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, *each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112*." *Zenon Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007) (emphasis added).  In other words, "there has to be a continuous chain of copending applications each of which satisfies the requirements of § 112 with respect to the subject matter presently claimed."  *In re Hogan*, 559 F.2d 595, 609 (C.C.P.A. 1977) (citations and quotations omitted; alteration in original).

Thus, for the Asserted Patents to claim priority to the '724 Patent, there must be continuity of disclosure:  *each and every* intervening application filed between the Asserted Patents and the '724 Patent must provide written description support for every limitation in the Asserted Claims. *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008).  "[I]f *any* application in the priority chain fails to make the requisite disclosure of subject matter, the later-filed application is not entitled to the benefit of the filing date of applications preceding the break in the priority chain."  *Hollmer v. Harari*, 681 F.3d 1351, 1355 (Fed. Cir. 2012) (emphasis added).

AGIS cannot demonstrate continuity of disclosure here.  Every Asserted Claim requires that mobile devices receive a "*georeferenced* map" from a remote "server."  *See* Ex. 1, § IV. "Georeferenced" is a critical element of the claims that requires data correlating x/y positions on a screen's map display to real-world latitude/longitude positions.  Ex. 4 ('829) at 7:2-8.  Thus, a server sending a "georeferenced" map must send not only the map, but also additional data relating map display positions to real-world latitude/longitude coordinates.  By contrast, while a generic, non-georeferenced map can show symbols on a screen's map display, it does not correlate those symbols' screen positions to any real-world locations.

The *only* application in the priority chain that provides written description support for the limitation of receiving a "*georeferenced* map" from a "server" limitation is the '724 Patent.  None of the other intervening applications that followed—including the '410 Application filed in 2013— provide written description support for that limitation.  In particular, the '410 Application does not describe that limitation; nor does it incorporate by reference the '724 Patent and its disclosures describing a device receiving "georeferenced maps" from a "server."  Accordingly, the Asserted

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

Patents that descend from the '410 Application cannot claim priority to the '724 Patent and are instead anticipated by it.

### A.   The '410 Application Fails To Incorporate The '724 Patent

The '724 Patent provides written description support for the limitation of a mobile device receiving a "georeferenced map" (or "georeferenced map data") from a remote "server," which appears in all Asserted Claims.  Thus, *if every* application that followed incorporated by reference the '724 Patent, there would be written description support for that limitation throughout the priority chain, and the Asserted Patents could claim priority to the '724 Patent's 2006 filing date.  But the intervening applications, including the '410 Application, fail to incorporate the '724 Patent.

For a patent to incorporate material by reference, "the host document must identify with *detailed particularity* what specific material it incorporates and *clearly indicate where* that material is found."  *Zenon*, 506 F.3d at 1378 (emphases original).  "[T]he incorporating [document] must use language that is *express* and *clear*, so as to leave *no ambiguity* about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated."  *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008) (emphases altered).

The '410 Application does not include a clear, express, unambiguous statement incorporating by reference the '724 Patent.  Its sole incorporation statement reads:

> The method and operation of communication devices used herein are described in U.S. Pat. No. 7,031,728 which is hereby incorporated by reference and U.S. Pat. No. 7,630,724.  (Ex. 22 ¶ 5.)

The statement incorporates only the '728 Patent—but it fails to incorporate the '724 Patent for three reasons.  First, based on standard grammar rules, the clause "which is hereby incorporated by reference" is a relative clause that refers back to the noun—"U.S. Pat. No. 7,031,728"—that immediately precedes it. The "which . . ." clause does not refer to the '724 Patent that appears later in the sentence.  Second, the clause uses the singular verb "is," confirming that only one patent (i.e., the '728 Patent) is incorporated by reference, not multiple patents.

Third, "[a]s a matter of law, the mere notation of prior applications is not sufficient to

incorporate by reference any contents of those prior applications"; instead, an express statement of incorporation is required. *Ledergerber Med. Innovations, LLC v. W.L. Gore & Assocs., Inc.*, 736 F. Supp. 2d 1172, 1180-81 (N.D. Ill. 2010). In *Ledergerber*, the court granted summary judgment of anticipation by a parent application on similar facts, where the asserted patent did not incorporate that parent by reference. The court reasoned that although the patent "identified the prior applications in the chain," "it did not specifically indicate that it was incorporating the disclosures of those applications." *Id*. The court concluded that mere "reference to the earlier applications and patents in the chain contained in the [asserted patent] application was therefore insufficient to satisfy the written description requirement of § 112 as required for continuity of disclosure." *Id*. *Ledergerber* follows precedents set long ago by the Federal Circuit's predecessor, the United States Court of Customs and Patent Appeals, holding that merely identifying prior, parent applications is insufficient to incorporate them by reference. *E.g.*, *In re De Seversky*, 474 F.2d 671, 674 (C.C.P.A. 1973) ("the statement that an application is a continuation-in-part, or a continuation, or a division, . . . is not an incorporation of anything therein into the application containing such reference for the purposes of the disclosure"); *In re Lund*, 376 F.2d 982, 990-91 (C.C.P.A. 1967). Thus, the '410 Application's mere notation of the '724 Patent is insufficient to incorporate it.

This exact issue for these exact patents has been decided several times already by the U.S. Patent Office. In IPR institution decisions for the '251, '838, and '829 Patents, the PTAB found that the '410 Application fails to incorporate by reference the '724 Patent. Ex. 27 ('251 IPR) at 18-20; Ex. 28 ('838 IPR) at 15-17; Ex. 29 ('829 IPR) at 10-14. In later reexamination proceedings for the Asserted Patents, the U.S. Patent Office confirmed again that the '410 Application fails to incorporate by reference the '724 Patent. Ex. 30 ('251 EPR) at 3-6; Ex. 31 ('838 EPR) at 3-6. The same correct finding of no incorporation by reference of the '724 Patent should be made here.

**B.     The '410 Application Does Not Support The Asserted Claims' Limitation Of Receiving Georeferenced Maps From A Server**

Because neither the '410 Application nor any application filed before it incorporated by reference the '724 Patent, ***every one*** of those intervening applications must provide written description support for the Asserted Claims for those claims to be entitled to the benefit of the '724

Patent's filing date. "[I]f *any* application in the priority chain fails to make the requisite disclosure of subject matter, the later-filed application is not entitled to the benefit of the filing date of applications preceding the break in the priority chain." *Hollmer*, 681 F.3d at 1355 (emphasis added). Here, at least one intervening application—the '410 Application—does not provide the requisite written description support, thus breaking the priority chain.

All Asserted Claims require that a mobile "device" receive a "georeferenced map" (or "georeferenced map data") from a remote "server." *See* Ex. 1, § IV (claim addendum). The only patent in the priority chain preceding the Asserted Patents that discloses these limitations is the '724 Patent. In particular, the '724 Patent describes a "remote *server* that causes a *geo-referenced* chart, *map*, aerial photograph or satellite image to be sent to the requestor's cell phone/PDA device." Ex. 23 ('724) at 19:2-7 (emphasis added).

But the '724 Patent's disclosure is not in the '410 Application. The three intervening continuations-in-part filed between the '724 Patent and the '410 Application made substantial additions *and deletions* to the specification—one of which was removing the '724 Patent's description of a "remote server" sending a "geo-referenced" "map" to a mobile device. *See* Ex. 20 (redline comparison of '410 Application to '724 Patent).

The '410 Application does not provide any other similar description of a "georeferenced map" being sent to a mobile device through a "server." To the contrary, in the few instances where the '410 Application mentions "geo-referenced" information of any kind, it either (1) does not describe the "geo-referenced" information as being provided by a remote "server" (Ex. 22 ¶¶ 40, 44, 46) or (2) *contradicts* that understanding, by stating that the "geo-referenced" information is stored locally inside a user's mobile device, rather than being provided from a remote server (*id*. ¶¶ 34, 39). For example, paragraph 34 states that a central processing unit or "CPU" inside the device provides georeferenced information: "Mounted within housing 12 as part of the PDA [i.e., mobile device] is the display 16 and the CPU. The *internal CPU* includes databases and software application programs that provide for a geographical map and georeferenced entities" on the user's display. *Id*. ¶ 34 (emphasis added); Ex. 25 (Wolfe Opening) ¶¶ 314, 362, 399, 434.

The '410 Application does incorporate by reference the '728 Patent, so the '728 Patent's

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

disclosures might have been used to satisfy the written description requirement. But the '728 Patent likewise fails to disclose mobile devices receiving a "georeferenced map" from a "remote server." In fact, the '728 Patent does not even mention the word "server." Rather, it includes the same text quoted above from paragraph 34 of the '410 Application, explaining that "geographical map and georeferenced entities" are provided by a mobile device's internal CPU. Ex. 24 ('728) at 7:62-67.

AGIS may counter that in the *ex parte* reexamination proceedings for the Asserted Patents, Examiners at the U.S. Patent Office found that the '410 Application and '728 Patent provide written description support. Ex. 30 ('251 EPR) at 6-7; Ex. 31 ('838 EPR) at 6-7; Ex. 32 ('829 EPR) at 5; Ex. 33 ('123 EPR) at 5-6. But the Examiners were plainly wrong in this aspect of their decisions. Each of their decisions quoted and chiefly relied on this passage from the '728 Patent:

> By using these soft switches, and hard switches that are part of the cellular phone, the operator can activate different maps, change map scales, select which fixed entities are desired to be displayed, display the information concerning the symbol the operator has touched, initiate phone voice calls, send messages (text, photographs and videos), enter symbols and information representative of other entities, view the locations and statuses of the other communications net participants[.] Ex. 24 ('728) at 4:25-33.

This passage does not say anything about (1) "georeferenced" information, let alone "georeferenced maps," or (2) servers storing or sending any information.

The Examiners also string-cited paragraphs 34, 40, 46 in the '410 Application as describing "georeferenced maps." But as discussed, paragraphs 40 and 46 say nothing about those georeferenced maps being stored on remote servers, while paragraph 34 contravenes that understanding by describing how a mobile device's "internal CPU" provides georeferenced information. Ex. 22 ¶¶ 34, 40, 46. The Examiners also string-cited paragraphs 9-13 of the '410 Application as describing servers. But none of those paragraphs describe servers storing and sending "georeferenced" maps or information. *Id*. ¶¶ 9-13.

At best, paragraph 13 refers to an "IP Server . . . from which data can be requested by network participants (i.e. maps, satellite images, and the like)." *Id*. ¶ 13. But the passage says

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF

nothing about whether the "maps" and "satellite images" are **georeferenced**, meaning that in addition to the map, the server also sends data correlating x/y coordinates on the map to real-world latitude and longitude coordinates to network participants. Ex. 4 ('829) at 7:2-8.

Indeed, during prosecution of the asserted '251 Patent, AGIS distinguished between (1) generic maps in the prior art cited by the Examiner and (2) the "georeferenced" maps required by its claims. Specifically, AGIS distinguished a reference's disclosure of a "floor map" that displayed "positions of other users" with symbols because the reference "does not teach or suggest that the floor map is a georeferenced map that includes data relating positions on the second georeferenced map to spatial coordinates." Ex. 34 ('251 FH) at AGIS200004179. So while there are many types of maps and satellite images, there is no disclosure in the '410 Application of a **georeferenced** map or satellite image—i.e., a map/image that includes additional data relating positions on a map image to spatial coordinates. Ex. 25 (Wolfe Opening) ¶¶ 316-318, 364-365, 400-401, 435.

The '410 Application and the '728 Patent, at most, mention in disparate places the distinct concepts of (1) a server and (2) displaying georeferenced maps that came from the internal CPU of the mobile device, not a server. But the two concepts are never discussed together to disclose a server providing georeferenced maps to a device. The Examiners' contrary conclusion from the *ex parte* reexaminations amounts to a finding of obviousness, suggesting that a person of ordinary skill might think to combine the separate disclosures of servers and georeferenced maps to arrive at the claims' limitations. But obviousness is insufficient as a matter of law to satisfy the written description requirement. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc) ("a description that merely renders the invention obvious does not satisfy the [written description] requirement"); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (stating that to satisfy the written description requirement, "[o]ne shows that one is 'in possession' of *the invention* by describing *the invention*, with all its claimed limitations, not that which makes it obvious") (emphases original).

Indeed, the PTAB previously reached a contrary conclusion from the Examiners who conducted the *ex parte* reexaminations, just as Google urges here. In IPR institution decisions, the PTAB found that the '410 Application failed to provide written description support for the Asserted

Claims' limitation of a "device" receiving a "georeferenced map" from a "server." Ex. 27 ('251 IPR) at 20-26; Ex. 28 ('838 IPR) at 17-19; Ex. 29 ('829 IPR) at 10-14. The same finding of no written description support should be made here.

### C. The '724 Patent Antedates And Anticipates The Asserted Claims

Because the '410 Application fails to provide written description support for the Asserted Patents' claims, the application breaks the priority chain, preventing the Asserted Patents from claiming priority to the '724 Patent. The Asserted Patents can claim priority only to October 31, 2014, the filing date of the '838 Patent, the first patent filed after the '410 Application. The '724 Patent, filed in 2006, therefore predates the Asserted Patents and qualifies as prior art. As discussed in Section III.E, the parties and their experts agree that the '724 Patent discloses each and every limitation of the Asserted Patents' claims. Thus, the '724 Patent anticipates all claims.

This scenario, where an ancestor patent anticipates a child patent because of a break in priority, is not without precedent. In *Zenon*, the Federal Circuit found an asserted patent was anticipated by an ancestor patent because an intervening application in the priority chain failed to incorporate by reference the relevant disclosures of the ancestor patent. 506 F.3d at 1380-82. As a result, the Federal Circuit concluded, a "lack of continuity of disclosure exists in the family chain [and thus] the [asserted] patent is not entitled to the filing date of the [ancestor] patent." *Id*. at 1382. Thus, the "[asserted] patent is anticipated by the [ancestor] patent" because "it is undisputed that the [ancestor] patent discloses each and every limitation of the claims of the [asserted] patent." *Id*. The facts here are materially the same and so should be the result: because of a break in the priority chain, the Asserted Claims are anticipated by their ancestor, the '724 Patent.

## VIII.   WAZE CANNOT BE A WILLFUL INFRINGER

The Court should also grant Waze summary judgment of no willful infringement because it is undisputed that Waze had no pre-suit knowledge of the Asserted Patents. To prove willful infringement, "the patentee must show the accused infringer had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021) (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016)). Knowledge of the patent and its infringement is a prerequisite to a finding of willful infringement. *WBIP, LLC*

*v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (citing *Halo*, 136 S. Ct. at 1932-33). This Court has, accordingly, granted summary judgment of no willful infringement where there was no evidence of any pre-suit notice of infringement. *Power Integrations, Inc. v. ON Semiconductor Corp.*, No. 5:16-cv-06371-BLF, ECF 287 at 52-53 (N.D. Cal. Aug. 7, 2019). Here, the facts in favor of summary judgment are stronger than in *Power Integrations*: there is no evidence (or any allegation) that Waze knew of AGIS's patents, let alone its alleged infringement, before AGIS filed its lawsuit on November 4, 2019. Ex. 19 (AGIS 2d Suppl. Resp. to 1st Set of Interrogs.) at 19. The Court should thus grant summary judgment of no willful infringement.

## IX.     CONCLUSION

For the foregoing reasons, the Court should grant summary judgment that (1) Google and Waze do not infringe the Asserted Claims; (2) the Asserted Claims are invalid as anticipated by the '724 Patent; and (3) Waze does not willfully infringe the '829 and '123 Patents.

Dated:  April 3, 2023

By:     */s/ Mark Liang*

DARIN W. SNYDER
LUANN L. SIMMONS
DAVID S. ALMELING
MARK LIANG
BILL TRAC
AMY K. LIANG
SORIN G. ZAHARIA
STACY YAE
**O'MELVENY & MYERS LLP**

*Attorneys for Defendants*
*GOOGLE LLC and WAZE MOBILE*
*LTD.*

DEFENDANTS' NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT
NO. 5:22-CV-04826-BLF